# STATE OF WEST VIRGINIA

## SUPREME COURT OF APPEALS

FILED
April 14, 2016
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**CHARLESTON HAULING,**
**Employer Below, Petitioner**

**vs.)    No. 15-0286** (BOR Appeal No. 2049700)
              (Claim No. 2011005314)

**TERRY MILLER,**
**Claimant Below, Respondent**


## MEMORANDUM DECISION

Petitioner Charleston Hauling, by Mark J. Grigoraci, its attorney, appeals the decision of the West Virginia Workers' Compensation Board of Review.

This appeal arises from the Board of Review's Final Order dated February 25, 2015, in which the Board affirmed a July 28, 2014, Order of the Workers' Compensation Office of Judges. In its Order, the Office of Judges reversed the claims administrator's May 22, 2013, decision to deny neurological and cognitive diagnoses as compensable conditions. The Office of Judges also reversed the claims administrator's May 22, 2013, decision to close the claim for temporary total disability benefits. The Court has carefully reviewed the records, written arguments, and appendices contained in the briefs, and the case is mature for consideration.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

Mr. Miller, a garbage man for Charleston Hauling, was exposed to an unknown chemical on August 5, 2010, when a trash bag busted. His application for benefits and emergency room records indicated he threw a bag into the truck and it ruptured in his face. Mr. Miller was transported to the emergency room and examined by Kenneth Sells, D.O. Mr. Miller's breathing was so taxed that he went into respiratory failure and had to be intubated. The records indicate erythema over the entire face and chest as well as a rash over the abdomen and legs. The assessment was acute respiratory failure and atopic dermatitis. The claimant was examined by a

1

host of other doctors during his hospital stay. A CT scan of his head showed no abnormality of the brain. A chest x-ray revealed stable findings, and an EEG was interpreted as normal. Chaohua Yan, M.D., examined Mr. Miller who reported intermittent blurry vision, light-headedness, generalized weakness, and short-term memory difficulties. Sometimes Mr. Miller had difficulty speaking. His neurological examination was significant for mild slowing of speech, generalized weakness, mild bilateral dysmetria, positive Romberg sign, and decreased sensation over the right side. Dr. Yan's impression was intermittent mental status change post toxic chemical exposure. On August 13, 2010, Dr. Sells felt Mr. Miller was stable enough to be discharged home with instructions to continue physical and speech therapy.

On August 17, 2010, hand-written physical therapy notes from Pat Ellis, MSPT, indicated shortness of breath and severe weakness in both lower extremities. Mr. Miller was unable to perform his activities of daily living as before the injury. On October 10, 2010, a nerve conduction study was interpreted by Dr. Yan as showing evidence of chronic polyneuropathy.

On November 11, 2010, Mr. Miller testified in a deposition that after the injury he was unable to talk or walk and had trouble breathing. He was examined by Dr. Yan, a neurologist; Kamel Marzouk, M.D., a lung specialist; Dr. Mitchell Rashid, M.D., a heart specialist; and Dr. Sells. He was in the hospital for eight days and stated that he had to use a walker when he was discharged as he was still having difficulty walking. Mr. Miller stated that after his release from the hospital, he was evaluated by Karim Katrib, M.D., an ear, nose, and throat specialist. Dr. Katrib released him to return to work as far as his throat was concerned. However, he had not yet been released to return to work by Dr. Sells, Dr. Marzouk, or Dr. Yan. Mr. Miller testified that he was still having problems with his breathing and left leg. He denied any problems with his breathing or left leg prior to the August 5, 2010, injury. He also stated that he was still treating with Dr. Sells, Dr. Yan, and Dr. Marzouk.

On July 11, 2011, an independent medical evaluation issued by George Zaldivar, M.D., opined that Mr. Miller was at maximum medical improvement from a pulmonary standpoint. Dr. Zaldivar deferred to Dr. Yan on the neurological issues. On May 3, 2015, neurologist Kuruvilla John, M.D., issued a review of Mr. Miller's records. His report concluded that Mr. Miller had peripheral neuropathy of unknown etiology. Dr. John did not believe that these problems were related to the compensable injury. Dr. John stated that some of Mr. Miller's records showed a history of pre-diabetes and noted that neuropathy can occur in a person with such a history. He further noted that while it was not unusual for a patient who has been hospitalized for pneumonia to experience some transient confusion, it should not lead to permanent neurological deficits. Finally, Dr. John opined that the only pesticides that cause generalized weakness are organophosphorus compounds, and, according to his review of the records, Mr. Miller was not exposed to organophosphorus compounds.

On May 22, 2013, the claims administrator denied any additional compensable conditions in the claim. By a separate Order on the same day, it also closed the claim for temporary total disability benefits with a closure date of August 27, 2010. Records indicated that Dolores Santamaria, M.D., examined Mr. Miller in relation to his neuropathy on August 13, 2013. It was noted that Mr. Miller's symptoms started three years prior after a chemical exposure at work. He

2

was previously evaluated by Dr. Yan who diagnosed peripheral polyneuropathy due to chemical exposure. Dr. Santamaria believed the neuropathy was caused by the compensable incident. She also noted that he suffered from a vitamin B-12 deficiency and hypothyroidism.

Both Dr. John and Dr. Santamaria were deposed in this case. On February 25, 2014, Dr. John stated that he could not tell from Mr. Miller's records whether or not he was actually exposed to organophosphorus compounds, which could have caused his peripheral neuropathy. Dr. John stated that 90% of the people in West Virginia who have peripheral neuropathy develop it as a result of diabetes. Although the records indicated that Mr. Miller had not been diagnosed with diabetes or treated for diabetes prior to August 5, 2010, Dr. John opined that diabetic neuropathy can develop prior to an actual elevation in blood sugar levels. Dr. John also testified that five years with a B-12 deficiency could lead to the development of peripheral neuropathy. Dr. John stated that he was unable to comment on whether or not Mr. Miller's pesticide exposure was sufficient to have caused peripheral neuropathy as he had never dealt with an inhalation injury from organophosphorus compounds. On May 15, 2014, Dr. Santamaria stated that she diagnosed Mr. Miller with profound peripheral neuropathy. She testified that exposure to a pesticide could definitely cause the condition. She relayed that both a B-12 deficiency and hypothyroidism could also contribute to the development of peripheral neuropathy. However, Dr. Santamaria opined there was a high probability that Mr. Miller's peripheral neuropathy was caused by his chemical exposure at work, especially considering that all of his symptoms started after his chemical exposure. Furthermore, Dr. Yan, Mr. Miller's first neurologist, also diagnosed peripheral neuropathy due to chemical exposure. When asked about Mr. Miller's diagnosis of pre-diabetes in 2003, Dr. Santamaria stated that borderline diabetes would not affect the motor fiber as demonstrated on the nerve study.

In its July 28, 2014, Order, the Office of Judges reversed the claims administrator's decision denying additional compensable components in the claim. It determined the evidence of record supported a finding that Mr. Miller developed peripheral neuropathy as a direct result of the compensable injury. The Office of Judges stated that Mr. Miller's treating neurologist, Dr. Santamaria, opined that he developed peripheral neuropathy as a result of the chemical exposure injury of August 5, 2010. Although Dr. Santamaria acknowledged that Mr. Miller had other non-compensable diagnoses which are known to contribute to peripheral neuropathy, she testified that there was a high probability that his condition was caused by the chemical exposure. The evidence also showed that Mr. Miller's symptoms started after the exposure. Furthermore, Dr. Santamaria's opinion was also shared by Dr. Yan, Mr. Miller's initial treating neurologist. The Office of Judges recognized that Dr. John stated in his report of May 3, 2013, that the only pesticides that cause generalized weakness are organophosphorus compounds. However, the Office of Judges noted Dr. John stated that he could not tell, based upon his review of the records, whether or not Mr. Miller was actually exposed to organophosphorus compounds. The Office of Judges determined that the shared opinions of Dr. Santamaria and Dr. Yan were the most persuasive because they had an opportunity to examine Mr. Miller in person, and a preponderance of the evidence supported their conclusions.

In its Order, the Office of Judges also reversed the claims administrator's decision to close the claim for temporary total disability benefits. Pursuant to West Virginia Code § 23–4–7a

(2005), temporary total disability benefits are suspended once a claimant has reached maximum medical improvement, has been released to return to work, or has actually returned to work, whichever occurs first. The Office of Judges noted that Mr. Miller's temporary total disability benefits were closed on August 27, 2010, based upon Dr. Katrib's finding that he could return to work from an ear, nose, and throat standpoint. However, as Mr. Miller testified, only Dr. Katrib released him to return to work. He had not been released to return to work by his treating physician, Dr. Sells; his treating pulmonologist, Dr. Marzouk; or his treating neurologist, Dr. Yan. The Office of Judges concluded that Mr. Miller remained temporarily and totally disabled on August 27, 2010. Accordingly, it reversed the claims administrator's decision and granted additional temporary total disability benefits as substantiated by proper medical evidence. The Board of Review adopted the findings of the Office of Judges and affirmed its conclusions on February 25, 2015.

After review, we agree with the consistent conclusions of the Office of Judges and Board of Review. The Office of Judges and Board of Review were well within reason to conclude that Mr. Miller's chemical exposure caused his peripheral neuropathy because the weight of the evidence supported that finding. The Office of Judges and Board of Review properly concluded that evidence has not been submitted to show that Mr. Miller is at his maximum medical improvement, has been cleared to return to work, or has actually returned to work. Therefore, it was proper for the Office of Judges and Board of Review to find that he remained temporarily and totally disabled as of August 27, 2010.

For the foregoing reasons, we find that the decision of the Board of Review is not in clear violation of any constitutional or statutory provision, nor is it clearly the result of erroneous conclusions of law, nor is it based upon a material misstatement or mischaracterization of the evidentiary record. Therefore, the decision of the Board of Review is affirmed.

Affirmed.

**ISSUED:  April 14, 2016**

**CONCURRED IN BY:**
Chief Justice Menis E. Ketchum
Justice Robin J. Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Allen H. Loughry II

4